FILED
CHARLOTTE, NC

MAR 2 2 2010

U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

JACK STRATTON, SOLOMON STRATTON,     )     Case No. 3:10-CV-137

                            Plaintiffs,       )

vs.                                  )     **COMPLAINT**

MECKLENBURG COUNTY DEPARTMENT OF   )
SOCIAL SERVICES,                 )

                            Defendant,    )

---

### NATURE OF THE CASE

1.    This original action arises under common law and 42 USC § 1983, Title VI of the Civil Rights Act of 1964 as amended at 42 USC § 2000d, et. seq., 18 USC § 1964(a)(c) (RICO), and 28 USC § 1367 (Supplemental). Claims are for declaratory and injunctive relief and compensatory and punitive damages.

2.    This action is in the nature of a common law bill in equity arising directly under the Due Process Clause of the 14th Amendment and North Carolina common and statutory law to vacate and enjoin the operation and enforcement of certain alleged "state court judgments" as void ab initio, unconstitutional, and the product of conspiracy, extrinsic fraud, and fraud upon the court.

3.    This is a constitutional challenge, facially and as applied, to the practices and policies employed by Mecklenburg County and the Mecklenburg County District 26 Courts pursuant to the implementation of NCGS Chapter 7B ("child protective services").

4.    Pursuant to 42 USC § 2000d-7, the State of North Carolina by its acceptance of federal funds has waived 11th Amendment sovereign immunity on Title VI civil rights claims.

5.    All claims arise from continuing wrongs perpetrated in furtherance of a continuing

criminal enterprise.

## JURISDICTION AND VENUE

6.    Original district court jurisdiction is invoked under 28 USC § 1331, 28 USC § 1343, 18 USC § 1964(a)(c), and 28 USC § 1367.

7.    Venue is proper pursuant to 28 USC § 1391(b). Plaintiff and the majority of Defendants reside in the district and Plaintiff's claims arise from acts perpetrated in the district.

## PARTIES

8.    Plaintiffs Jack Stratton and Solomon Stratton are father and son. (Po Box 480466, Charlotte, NC, 28269).

9.    Defendant Mecklenburg County Department of Social Services is the local DSS. (301 Billingsly Rd., Charlotte, NC 28211).

## HOW THE MECKLENBURG COUNTY CHILD TRAFFICKING OPERATION STEALS CHILDREN

10.    Several decades ago, criminals infiltrated the closed and secretive Mecklenburg County Juvenile Courts. Hiding behind the juvenile court "cloak of confidentiality" these individuals set up a covert child trafficking criminal enterprise ("enterprise").

11.    The enterprise put into operation a scheme to secretly and illegally seize, hold, and "adopt out" children without any pre-deprivation or post-deprivation due process of law.

### North Carolina Seizes Children Without Pre-Deprivation Due Process

12.    In 2003, Mecklenburg County Department of Social Services ("DSS") Attorney Tyrone Wade was deposed in the N.C. case of *Yinka Fasinro vs Mecklenburg County.*
Wade admitted in the deposition that pre-deprivation juvenile court hearings do not exist in Mecklenburg County or anywhere in the State of North Carolina.

2

13. 100% of children seized by the state of North Carolina are seized with *ex parte* nonsecure orders and receive no due process notice or opportunity to respond prior to the seizure.

### Mecklenburg County Child Trafficking Scheme Eliminates AOC Juvenile Forms

14. The North Carolina Administrative Office of the Courts ("AOC") issues official forms to be used by every DSS and juvenile court in the state. Each AOC form has numbers and letters identifying the form.

15. Beginning no later than the early 1990's the enterprise replaced the official state AOC juvenile forms with paper frauds, including a fake and fraudulent "non-secure custody order" and "Juvenile Summons."

16. The enterprise has used the fraudulent juvenile forms to illegally seize thousands of children over the past two decades.

### "Conscience Shocking" Extrinsic Fraud Scheme Eliminates Post Deprivation Due Process Hearings Mandated by NCGS § 7B-506

17. It is well established in federal and state case law that, although exigent circumstances may allow a child to sometimes be removed from his parents without a pre-deprivation hearing, in no case can a child ever be removed and held without a prompt post-deprivation hearing.

18. NCGS § 7B-506 "Hearing to determine need for continued nonsecure custody" mandates:

"(a)     **No juvenile shall be held** under a nonsecure custody order for more than seven calendar days without a hearing on the merits or a hearing to determine the need for continued custody...
(b)     At a hearing to determine the need for continued custody, the court shall receive testimony and shall allow the guardian ad litem, or juvenile, and the juvenile's parent, guardian, custodian, or caretaker an opportunity to introduce evidence, to be heard in the person's own behalf, and to examine witnesses. The State shall bear the burden at every stage of the proceedings to provide clear and convincing evidence that the juvenile's placement in custody is necessary."

19. The post-deprivation hearings mandated by GS § 7B-506 do not exist in Mecklenburg County. They have been eliminated through the extrinsic fraud scheme set forth below.

3

20. The first step in the child trafficking scheme to eliminate § 7B-506 hearings is to eliminate notice of the hearings.

21. The North Carolina Juvenile Code at NCGS § 7B-406 "Issuance of summons" mandates the following:

> (a) "Immediately after a petition has been filed alleging that a juvenile is abused neglected, or dependent, the clerk shall issue a summons to the parent, guardian, custodian, or caretaker requiring them to appear for a hearing at the time and place stated in the summons. A copy of the petition shall be attached to each summons. **A summons shall be on a printed form supplied by the Administrative Office of the Courts and shall include:**
> (1)    Notice of the nature of the proceeding;
> (2)    Notice of any right to counsel and information about how to seek the appointment of counsel prior to a hearing;(3)Notice that, if the court determines at the hearing that theallegations of the petition are true, the court will conduct a dispositional hearing to consider the needs of the juvenile and enter an order designed to meet those needs and the objectives of the State; and
> (4)    Notice that the dispositional order or a subsequent order:
> a. May remove the juvenile from the custody of the parent, guardian, or custodian.
> b. May require that the juvenile receive medical, psychiatric, psychological, or other treatment and that the parent participate in the treatment.
> c. May require the parent to undergo psychiatric, psychological, or other treatment or counseling for the purpose of remedying the behaviors or conditions that are alleged in the petition or that contributed to the removal of the juvenile from the custody of that person.
> d. May order the parent to pay for treatment that is ordered for the juvenile or the parent."

22. The "printed form supplied by the Administrative Office of the Courts" mandated by NCGS § 7B-406 is state form AOC-J-142 entitled "Juvenile Summons and Notice of Hearing."

23. The enterprise has replaced AOC-J-142 with a fake entitled "Juvenile Summons." The fake eliminates the words *"and Notice of Hearing"* from the title and then falsely states that the

4

hearing is for the following purpose:

> "YOU ARE HEREBY SUMMONED TO APPEAR in Juvenile Court in the Criminal Courts Building, 700 East Fourth, Charlotte, North Carolina at _____ o'clock ____ M., on the ____ day of _____, _____ the first day of Juvenile Court following service, for a hearing to consider the appointment of counsel for the parents(s) (in abuse, neglect, or dependency proceedings) and the child and to set a date for hearing on the petition served with this summons." (Emphasis in original).

24.    The fraudulent "Juvenile Summons" removes all notice of the statutorily mandated § 7B-506 post-deprivation due process hearing and instead falsely (and illegally) tells parents that the upcoming hearing is only "to appoint counsel" and to "set a date for (a) hearing."

25.    After eliminating all notice of the § 7B-506 hearing, the conspirators move to the next step: the total elimination of the hearings themselves.

### Extrinsic Fraud Eliminates § 7B-506 Hearings

26.    Mecklenburg County holds no § 7B-506 due process hearings as mandated by law. Instead there is a quick "hearing to appoint counsel" and "set a date for (a) hearing."

27.    Because the fraudulent "Juvenile Summons" eliminates § 7B-406 notice, parents are totally unaware that: (a) they have just been deprived of a statutorily mandated § 7B-506 due process hearing; and (b) their children are being illegally held in violation of § 7B-506

### Fake "Court Orders" Claim Parents "Consented" to State Seizure of Their Children

28.    After denying parents a GS § 7B-506 seven day hearing, the conspirators plant into the "file" one of their paper frauds entitled "Initial (7-Day) Order" that falsely claims:

> "An INITIAL (7-DAY) HEARING was held pusuant to N.C.G.S. § 7B-506 on _____, _____. The Court finds by CLEAR and CONVINCING EVIDENCE that:..."

29.    The "Initial (7-Day) Order" falsely checks off a box stating the child continues to be held because: *The parent consented to the non-secure custody."*

30.    Parents never see the "Initial (7-Day) Order" and so never discover the fraud.

31.     The "Initial (Seven-Day) Order" alleges to contain additional findings of fact, conclusions of law, and judicial orders based on a hearing that never took place.

32.     NCGS § 7B-506(e) mandates that after the initial seven day hearing "...a subsequent hearing on continued custody shall be held within seven business days of that hearing...and pending a hearing on the merits, hearings thereafter shall be held at intervals of no more than 30 calendar days."

33.     To overcome these mandated hearings, the conspirators insert in their "Initial (7-Day) Order" (on a back page in an obscure location) that:

> *"The right to a hearing within seven days to determine the need for continued nonsecure custody will be waived unless it is appropriately asserted."*

34.     The statutorily mandated burden on the state to have § 7B-506(e) hearings is shifted to the parents, who must "appropriately assert" their right to the hearings or lose them.

35.     It is impossible for parents to "appropriately assert" their right to § 7B-506(e) hearings because they are not aware of the existence of the "Initial (7-Day) Order" or its secret "requirement."

### Extrinsic Fraud Denies Right to Counsel

36.     Instead of notifying parents of their right to counsel as mandated by GS § 7B-406(b)(2), Mecklenburg County secretly "court appoints" attorneys for parents before any hearings take place and without the parents' knowledge or consent.

37.     The "court appointed" attorneys come from a pool of hand-picked conspirators joined in the Mecklenburg County child trafficking criminal enterprise.

38.     The court appointed attorneys are joined in perpetrating the "seven day hearing" fraud. They prevent parents from discovering and exercising their due process rights and thereby getting their children back.

39.    Conspirator guardian ad litem ("GAL") attorneys are "court appointed" to the children without parental knowledge or consent and before the parents are found "guilty" of anything.

40.    The fraud makes the children "clients" of the GAL conspirator attorneys. "Attorney-client privilege" is then invoked by the child traffickers to completely cut the children off from their parents, the family attorney, and everyone else outside the criminal enterprise.

41.    The North Carolina GAL manual contains form letters notifying parents that children are not allowed to talk to their parent's attorney *even if the child wants to."*

42.    A second form letter from the N.C. GAL manual to the family attorney states:

> "Further, the Guardian ad Litem and I specifically prohibit...you, or any agents or anyone on behalf of any attorney involved in this case...from having any contact whatsoever with my client or discussing this case with him/her in any manner."

43.    The conspirator GAL attorneys thereby *isolate and hold children hostage.* No one besides the child traffickers ever again have access to the children.

## Extrinsic Fraud Eliminates Adjudication Hearings

44.    NCGS § 7B-802 (2001) states that:

> "The adjudicatory hearing shall be a judicial process designed to adjudicate the existence or nonexistence of any of the conditions alleged in a petition. In the adjudicatory hearing, the court shall protect the rights of the juvenile and the juvenile's parent to assure due process of law."

45.    The conspirators eliminate adjudication hearings through a scheme called a "Dependency Mediation Agreement."

46.    The "Dependency Mediation Agreement" is used against all families, including those whose children are not dependent.

47.    The conspirators terrorize parents by telling them they must sign the "Dependency Mediation Agreement" if they want to get their children back. .

7

48.     The "Dependency Mediation Agreement" is subsequently presented as a "plea bargain" admission of guilt.

49.     The "plea bargain" eliminates the right to an adjudicatory (evidentiary) hearing and thereby covers up the previous illegal acts used by the conspirators to seize and hold children.

### Bottom Line of the Extrinsic Fraud Scheme

50.     Using the above criminal scheme enables the child traffickers to:

   (a) Eliminate all pre-deprivation hearings with their ex parte orders.
   (b) Eliminate all post-deprivation hearings with their fraudulent "Juvenile Summons" and "Initial (7-Day) Order."
   (c) Eliminate all adjudicatory hearings with their fraudulent "Dependency Mediation Agreement."

51.     The net effect of the child trafficking scheme is that children are seized and held in state custody indefinitely with NO DUE PROCESS WHATSOEVER AND WITH THE STATE NEVER HAVING TO PRODUCE ANY WITNESSES OR EVIDENCE.

52.     The "case" then moves to the "dispositional" stage and the child traffickers now have their victims under a completely different legal standard, the "best interests of the child" standard, as interpreted by the child traffickers.

### Mecklenburg County's Paper Fraud "Nonsecure Custody Order"

53.     An official state juvenile non-secure custody form is issued by the North Carolina Administrative Office of the Courts ("AOC") and is to be used statewide in all 100 counties. The form is AOC-J-150 entitled "Order For Nonsecure Custody."

54.     The child traffickers replaced AOC-J-150 with one of their paper frauds entitled "Nonsecure Custody Order."

55.     Mecklenburg County's "Nonsecure Custody Order" appears on its face to list the six criteria for nonsecure custody in GS § 7B-503(a)(1-6). However, a closer reading shows that the

8

wording and the criteria of GS § 7B-503(a)(3) has been fraudulently changed. The changes (in bold) read:

> "The juvenile is exposed to a substantial risk of physical injury or sexual abuse because the parent, guardian, or custodian **has inflicted the injury or abuse;** created the conditions **causing the injury, abuse, or exposure;** failed to provide, or is unable to provide, adequate supervision or protection; or"

56.     The order has a check box beside each of the six criteria listed.

57.     The fake nonsecure order fabricates "abuse criteria" that is not in the statute by adding "has inflicted the injury or abuse" and changing "likely to cause" to "causing."

58.     The fake inserts two semicolons into the statute. The actual statute has no semicolons in its body.

59.     The insertion of the semicolons changes the statute from one continuous sentence dealing exclusively with risk of physical injury or sexual abuse into three separate stand alone clauses. The last clause, "failed to provide, or is unable to provide, adequate supervision or protection" becomes a stand alone "neglect" clause.

60.     The changed "statute" adds a further false neglect indication by changing "injury or abuse" to "injury, abuse, _or exposure_."

61.     The stand alone phrase "failed to provide, or is unable to provide, adequate supervision or protection" creates criteria so vague it allows Mecklenburg County to target and seize any child for "neglect" any time, for any reason, or for no reason.

62.     Mecklenburg County uses the fraud to seize children on a vast array of fabricated and fraudulent "neglect" criteria such as poverty, home schooling, male "control" of the family, failure to "cooperate" with DSS, etc.

63.     The inclusion of fabricated "abuse" and "neglect" criteria into the same "removal statute" also allows Mecklenburg County to seize children on vague allegations of neglect, manufacture

fraudulent post-seizure "evidence" of abuse, and retroactively claim that abuse was the original allegation.

64.     95% of children seized from their parents by the Mecklenburg County DSS are seized with a fake "statute" that does not exist.

## STATE OF NORTH CAROLINA JOINED IN THE CHILD TRAFFICKING CRIMINAL ENTERPRISE

65.     The child trafficking conspiracy reaches to the highest levels of North Carolina government.  This is shown by the fact that Mecklenburg County's fraudulent juvenile forms, including the fake "Juvenile Summons" (on its face a fraudulent and illegal violation of NCGS § 7B-406) is regularly:

  (a)  Sent up to the N.C. Appellate Courts on appeal
  (b)  Regularly reviewed in Mecklenburg County DSS case files by the N.C. Department of health and Human Services
  (c)  Regularly reviewed by the N.C. AOC.  The AOC regulates the Mecklenburg County Court System, oversees the Mecklenburg County GAL program, and issues and controls the official state AOC documents that have been fraudulently replaced by Mecklenburg County.

### Conspiracy and Extrinsic Fraud Embedded in North Carolina Juvenile Code

66.     Embedded in the North Carolina Juvenile Code [NCGS Chapter 7-B] is an extrinsic fraud "bait and switch" scheme designed to steal children.

67.     The scheme revolves around fraudulent "neglect" criteria planted in the Juvenile Code at GS § 7B-101(15) ("Definitions-Neglected juvenile") and GS § 7B-1111(a)(1) ("Grounds for terminating parental rights").  The criteria reads:

  "The juvenile does not receive proper care, supervision, or ☐acilitato from the juvenile's parent, guardian, custodian, or caretaker"..."The juvenile lives in an environment injurious to the juvenile's welfare."

68.     95% of children seized from their parents by the state are seized under the above alleged

"neglect" criteria. No such neglect criteria to seize children exists in North Carolina statutory law.

69. NCGS § 7B-503(a) outlines six criteria for nonsecure custody:

(a) An order for nonsecure custody shall be made only when there is a reasonable factual basis to believe the matters alleged in the petition are true, and
(1) The juvenile has been abandoned; or
(2) The juvenile has suffered physical injury or sexual abuse; or
(3) The juvenile is exposed to a substantial risk of physical injury or sexual abuse because the parent, guardian, custodian, or caretaker has created the conditions likely to cause injury or abuse or has failed to provide, or is unable to provide, adequate supervision or protection; or
(4) The juvenile is in need of medical treatment to cure, alleviate, or prevent suffering serious physical harm which may result in death, disfigurement, or substantial impairment of bodily functions, and the juvenile's parent, guardian, custodian, or caretaker is unwilling or unable to provide or consent to the medical treatment; or
(5) The parent, guardian, custodian, or caretaker consents to the nonsecure custody order; or
(6) The juvenile is a runaway and consents to nonsecure custody.

70. The only "neglect" definitions listed in GS § 7B-101(15) that are also listed as criteria for removal in GS § 7B-503(a)(1-6) are "abandonment"(1) and "medical neglect"(4).

71. GS § 7B-101(15) specifically defines "abandonment" and "medical neglect" as separate and distinct criteria from "lack of proper care" and "injurious environment").

72. When nonsecure custody orders are issued for alleged neglect (lack of "proper care" and "injurious environment"), it is not done under § 7B-503(a)(1)(abandonment) or § 7B-503(a)(3) (medical neglect), but under § 7B-503(a)(3).

## The North Carolina "Bait and Switch" Child Stealing Scheme

73. North Carolina uses its DSS "Juvenile Petition" (AOC-J-130) and its "Order For Nonsecure Custody" (AOC-J-150) to execute a 'bait and switch" child stealing scheme.

74. (AOC-J-150) correctly contains the six statutory criteria for removing children listed in NCGS § 7B-503(1-6). In contrast the DSS Petition (AOC-J-130) is a paper fraud that contains

11

the neglect "definitions" found in GS § 7B-101(15).

75.     The DSS Petition contains six alleged "neglect criteria" for removing children from the home. Four of the six alleged "criteria" do not statutorily exist in GS § 7B-503(1-6).

76.     The DSS Petition is used across the state to seize children on vague and statutorily unauthorized allegations of "neglect" ("neglect" meaning whatever a social worker says is "lack of proper care" or "injurious environment").

77.     A DSS social worker files (AOC-J-130) while a coconspirator judge simultaneously signs (AOC-J-150) and checks the box beside GS § 7B-503(3).

78.     The simultaneous filings give the surface appearance children are being removed due to exigent circumstances when in fact they are being seized without any legal authority whatsoever.

79.     After the child is seized, the conspirators do away with the § 7B-503(3) "abuse" criteria they used to justify the seizure. The case is quietly switched into a "neglect" case using the definitions in the DSS Petition and § 7B-101(15).

80.     95% of child removals in North Carolina are perpetrated using the neglect "bait and switch" scheme.

81.     NCGS § 7B-101(15) and NCGS § 7B-1111(a)(1) are extrinsic fraud "sleeper" statutes that were planted within the Juvenile Code by child trafficking conspirators.

82.     The "sleeper" statutes cannot be (legally) used to seize children, but "activates" after the seizure in the "dispositional" phase so that the (illegally) seized children can be "adopted out."

## The Secret Files

83.     The North Carolina child trafficking criminal enterprise seizes, holds, and "adopts out" children using SECRET FILES that only the child trafficking conspirators are allowed to see.

84.     All 100 DSS agencies in the state maintain and use the secret file system.

12

85.     The North Carolina Administrative Code ("NCAC") documents the secret files as official

state policy at 10A NCAC 70A .0112.

86.     Administrative rule NCAC 70A .0113 prohibits parents from access to the secret files

being used to steal their children.  Everyone else involved in the "juvenile case" is allowed

unfettered access to the files.

87.     The secret files are extensive and cover every aspect of the state's DSS "case" against the

family.

88.     The North Carolina DHHS Manual warns social workers not to reveal the contents of the

secret files to parents because then the parents would be able to appeal:

> "When families receive other social services, they have appeal rights among which is the
> right to examine the case record. If the parent were allowed to examine the CPS record,
> confidential information such as the child's statements or the identity of the reporter
> could be obtained." (NCDHHS Manual Chapter VIII-1424).

89.     Among the secret file "evidence" that the DHHS does not want parents to be able to

appeal are "the child's statements."

90.     Secret files make it impossible to determine whether heresay allegations by social

workers (including "the child's statements") are accurate or if they even occurred at all.

91.     It is impossible to defend against or appeal secret social worker allegations hidden in a

secret file.

### Genocide Against Patriarchal Christians and Establishment of the New State Religion of Feminism

92.     The North Carolina child trafficking scheme relies on a pervasive extrinsic fraud scheme

that operates under the generic term "domestic violence."

93.     Alleged "domestic violence" is one of the fraudulent "neglect criteria" used to steal

children in the North Carolina "bait and switch" child stealing scheme.

13

94.     The term "domestic violence" is a code phrase for a radical lesbian / feminist agenda being used as a tool in western society to destroy the traditional family.

95.     The stated goal of radical feminism is to destroy "the patriarchy" (feminist term for male "control") by taking children away from parents and raising them in state custody.

96.     The United States Department of Health and Human Services ("USDHHS") enforces the feminist agenda, as shown by the following statement of Dr. Mary Jo Bane, former Assistant Secretary for Children and Families, United States Department of Health and Human Services:

> "In order to raise children with equality, we must take them away from families and communally raise them."

97.     Article II of the 1948 International Convention on the Prevention and Punishment of Genocide states: "In the present Convention, genocide means any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:

(a) Killing members of the group;

(b) Causing serious bodily or mental harm to members of the group;

(c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;

(d) Imposing measures intended to prevent births within the group;

(e) *Forcibly transferring children of the group to another group.*

98.     The Mary Jo Banes' statement previously quoted shows the official policy of the USDHHS is to perpetrate genocide against patriarchal Christians by forcibly *"tak(ing) them away from families"* and *"transferring them to another group."*

99.     North Carolina enforces the USDHHS radical feminist agenda by using "domestic

violence" allegations within its CPS system to seize children from families that practice Christian "patriarchal" religious beliefs.

100. There is no statutory authority in North Carolina for seizing children for "domestic violence." Furthermore, using "domestic violence" allegations to seize children is specifically prohibited by the North Carolina DHHS Manual's "Screen Out Tool" which states that domestic violence is "not a CPS issue."

101. The USDHHS and North Carolina's CPS and "domestic violence" programs use the radical lesbian / feminist definition of "domestic violence":

> "Battering is an intentional act used to gain *power and control* over another person." (From the official Charlotte-Mecklenburg website)

> "Domestic violence is really all about *power and control*, I think even more than hitting." (Karen Thompson of Mecklenburg County's United Family Services).

> "We believe that *patriarchy and gender inequality play a central role* at both the personal and societal level *in creating and maintaining domestic violence*....We believe it is vital to understand and eliminate all forms of oppression including sexism, racism and homophobia." (N.C. Coalition Against Domestic Violence)

102. There is no N.C. statute that authorizes the state seizure of children for "patriarchy" and "gender inequality" or because rabid feminists have a a pthological obsession with male "control."

103. Seized Christian children and their parents are forced into state "re-education" brainwashing programs to destroy the children's belief system and replace it with the official state belief system of feminism.

104. Mecklenburg County's feminist state re-education programs are the "Mecklenburg County Women's Commission" and "NOVA."

105. Women's Commission and NOVA are official government agencies / programs that receive millions of dollars in county and DSS funding and have offices at the DSS and in the

15

Mecklenburg County Courthouse.

106. Women's Commission and NOVA work in formal partnership with a Mecklenburg County non-profit agency called United Family Services. The agencies have shared space for staff and services, shared strategic planning, and shared staff training.

107. Marie White of the Women's Commission and Karen Parker Thompson of United Family Services are also on the Board of Directors of a radical feminist group called the North Carolina Coalition Against Domestic Violence ("NCCADV").

108. The NCCADV is linked to the Mecklenburg County website.

109. The NCCADV website states "The mission of NCCADV *is to create social change* through the elimination of the institutional, cultural, and individual oppressions that contribute to domestic violence."

110. The NCCADV is the state arm of the National Coalition Against Domestic Violence ("NCADV"). NCADV goals include: "organize for collective power..." and "work for major societal changes." The group says domestic violence results from "societal abuse of power."

111. The NCCADV has a "Lesbian / Bisexual Women's Caucus" and links to a radical feminist site entitled "North Carolina Women United" ("NCWU").

112. The NCWU site urges visitors to subscribe to its email list to "connect to the feminist movement in North Carolina."

113. The NCWU site states that "Batterer intervention programs" are designed to "help him / her *adopt a different world view...*"

114. NCWU membership includes radical feminist groups such as the National Abortion Rights Action League, the N.C Chapter of the National Organization for Women ("NOW"), Planned Parenthood of Central North Carolina, and Equality NC.

16

115.  Equality NC is a self-proclaimed "statewide advocacy organization that works to secure equal rights and justice for lesbian, gay, bisexual and transgender North Carolinians."

116.  NCWU links to the radical feminist NOW website which in turn links to hard core feminist sites such as "Hothead Paisan Homosexual Lesbian Terrorist"; "Club for Radical Feminists"; and "Young Radical Wimmin" (whose hatred of men is so profound they eliminated "men" from the word "women."

117.  NCCADV states that it "...coordinates public policy related to battered women...Staff and volunteers also sit on a variety of state committees...These include: Victim's Services Committee of the Governor's Crime Commission, the N. C. Public Health Alliance on Domestic Violence, N. C. Women United, the Covenant for North Carolina's Children, and the Governor's Commission on Domestic Violence."

118.  NCCADV states that it "...works closely with the Council for Women, Department of Social Services, Legal Services of N. C...and the North Carolina Medical Society..."

119.  The Charlotte-Mecklenburg website states "NOVA is a year long psycho-educational program...based on the widely acknowledged Duluth and ADA Curriculums.

120.  Mecklenburg County's Marie White has stated: "The NOVA program, first of all to get into the NOVA program almost all of the participants are court ordered or sent through Youth and Family Services...The groups run, the perpetrators are in for a year."

121.  The time required to complete the NOVA program coincides exactly with the minimum statutory amount of time the juvenile courts need to "terminate parental rights" and "adopt out" children.  Plaintiff alleges this is not a coincidence, but is a planned scheme to force the individual sent to the program to either: (a) totally renounce his patriarchal belief system and replace it with a feminist belief system as espoused by the NOVA "educator"; or (b) have the

17

juvenile court "terminate his parental rights" and "adopt out his children" for allegedly "willfully leaving his children in foster care without making progress to correct the conditions that brought them into custody."

122.    The "Duluth Curriculum" used by Mecklenburg County's NOVA program is based on an assessment tool called "The Power and Control Wheel." Under the wheel's section entitled "Using Male Privilege" are the following "domestic violence" definitions:

   (a)    Treating her like a servant
   (b)    Making all the big decisions
   (c)    Acting like the "King of the Castle"
   (d)    *Being the one to decide men's and women's roles*

123.    The Charlotte-Mecklenburg website lists "future predictors" of "domestic violence" as: "Does he have strong *traditional ideas* about what a man should be and what a woman should be? Does he think a woman should stay at home, take care of her husband, and follow his wishes and orders? In other words, does he act like women are second class citizens?

124.    The Charlotte-Mecklenburg website declares that one of the "characteristics of batterers" is *"He believes in rigid gender roles."*

125.    The Charlotte-Mecklenburg website states that domestic violence consists of "power and control, using male priviledge, treating her like a servant, making all the "big" decisions, *quoting misinterpreted Bible passages*, and acting like the "King of the castle."

126.    Mecklenburg County has published a widely distributed full color brochure stating that *traditional Christian marriage is a "<u>weapon</u> used in domestic violence."*

127.    Mecklenburg County's Marie White has stated that for a man to complete the NOVA program he must admit his (patriarchal) belief systems are "abusive" and give them up:

   "In order to get in the group, first of all, the perpetrators have to take some accountability for their actions, *they have to admit to being abusive*. Each group  is made up of a male

> and a female □acilitator and they, *its very difficult because      they address their belief systems, And they hold them accountable for their   actions and their belief system."*

> *"It is part of their belief system.* That's why most batterer's groups is, unless they are there court ordered or they're there with another authority to keep them there, *they leave because once you start challenging that belief system, who wants to sit through a year of that?*

128.    It is impossible for patriarchal Christians to complete the NOVA program without renouncing their Christian beliefs and embracing the feminist belief system.

129.    Christian mothers who voluntarily submit to their husbands as part of their Biblical religious beliefs are forced by the state to give up their beliefs and embrace feminism.

130.    Mecklenburg County's radical feminists force Christian mothers to renounce their religious beliefs (under threat of losing their children forever) even if the county is fully aware there was no violence. Dixie Lowery, a social worker who does "domestic violence assessments" for the Mecklenburg County, testified under oath in 2003 that:

> Many times women will come into us saying that they are not a victim because they do not understand what the dynamics are with domestic violence. *Many of them come in and they've never been physically assaulted. So they believe they're not a victim.* But they have all the other elements or many of the elements within the power and control wheel that *we would identify them as a victim.*

131.    Patriarchal Christian beliefs are proscribed, and the radical feminist agenda is mandated, statewide. The N.C. administrative code (01 NCAC 17 .0707) mandates that: "*All* abuser treatment programs...shall include...identification of the *personal, societal, and cultural values and beliefs* that legitimize and sustain violence and oppression."

132.    Mecklenburg County and the State of North Carolina have established radical feminism as the *de facto* official state religion (belief system), to be enforced by violence against innocent Christian families.

133.    Children of patriarchal Christians are seized by radical feminist judges, social workers

and GALs. The children are held hostage by the state indefinitely until the parents renounce their God and their religion.

134. If parents refuse to renounce their religious beliefs and fully embrace the state religion of feminism, the state "terminates parental rights."

135. The Charlotte-Mecklenburg website lists as "characteristics of batterers": "He is jealous, He blames others for his faults, He blames circumstances for his problems, He demonstrates unpredictable behavior, He always asks for another chance, He says he'll change, He plays on his partner's guilt/love, He is tenacious, He is closed minded, His way is the only way, He will seem charming to outsiders."

136. The above definitions of "domestic violence" include centuries-old elements of the common human experience. (Even "charm" becomes "domestic violence"). This makes virtually all parents "guilty" of domestic violence, allowing CPS to "broaden its net" and seize any child.

### Genocide Against Interracial Families and Bi-Racial Children

137. The USDHHS pays states $ 4,000.00 for every white child that is seized and "adopted out" but $6,000.00 for every black or bi-racial child that is seized and adopted out.

138. White children "adopt out" quicker than black children but do not pay the extra "bonus" money.

139. Seizing bi-racial children allows the child traffickers to easily "adopt out" the children and collect the maximum bounty.

140. Mecklenburg County has implemented the genocidal plan to collect the bounty. In 2002 it was revealed that the rate of Mecklenburg County DSS "substantiated neglect" was as follows: (a) white children **35%**; black children **43%**; bi-racial children **60%**.

141. In 2003, Mecklenburg County DSS attorney Twila George publicly admitted that it was

the policy of DSS to "adopt out" bi-racial children because it was easy to do.

## Two San Diego County Grand Juries Expose Jacobsen

142.    A 1991-92 San Diego County Grand Jury investigated Jacobsen and found he and his DSS were "unnecessarily removing children from their homes."

143.    A second Grand Jury found 70 million dollars in welfare fraud under Jacobsen's administration.

144.    A criminal fraud ring was also discovered operating within Jacobsen's DSS. Fifteen people were indicted, including five DSS employees. Three DSS employees went to prison.

145.    A huge scandal ensued and a series of scathing San Diego newspaper articles blasted Jacobsen. Calls for his resignation came from within his own office.

146.    Jacobsen attacked Grand Jury Foreman Carol Hopkins for being a "born again Christian."

147.    Jacobsen was removed as DSS Director, left San Diego in disgrace, and in 1994 was hired as Mecklenburg County DSS Director.

148.    Mecklenburg County officials have admitted they knew about Jacobsen's past before they hired him.

149.    From 1994 to 2007 Jacobsen was in charge of the Mecklenburg County child trafficking operation.

150.    In 2007 Jacobsen quickly "resigned" after he tried to steal several young children and was immediately served with a Federal lawsuit by the father.

151.    The enterprise moved Jacobsen to the UNCC Institute for Social Capital, a criminal front set up to build a massive child database to further the child trafficking operation.

## CHILD TRAFFICKERS KIDNAP JACK AND KATHY STRATTON'S 10 CHILDREN

### Mecklenburg County Child Traffickers Target Jack and Kathy Stratton's Ten Christian Bi-Racial Children

152. In 2000, Mecklenburg County lost federal adoption "bonus" money because they did not meet their "quota" for seizing and "adopting out" children. The quota in 2000 was 80 and the county only had 44 "adoptions."

153. Mecklenburg County targets bi-racial children because the children are highly "adoptable" while simultaneously paying 50% more in federal adoption "bonus" money than white children.

154. Jack and Kathy Stratton are an interracial couple with ten natural bi-racial children born to them since their marriage in 1982.

155. In December of 2000, the Stratton family was living at 2423 Eastway Drive in Charlotte, N.C.

156. On December 18, 2000, Mecklenburg County DSS got an anonymous phone call falsely claiming that the Stratton family had no heat and might not have enough food.

157. Mecklenburg DSS Supervisor Katherine Dorminey and her subordinate Gretchen Caldwell showed up at the Strattons' door.

158. Dorminey is a hostile "man hating" lesbian who used her position as DSS Supervisor to seek out and destroy "patriarchal" Christian families. (In 2002 Dorminey and her long-time female lover Donna Browning, a Charlotte-Mecklenburg Police Officer, bought a house together).

159. Dorminey and Caldwell viewed the ten Stratton children and left. They did not say they were going to return or that the Strattons were under any kind of investigation. No court paperwork had ever been filed and there was no "court case" anywhere against the Stratton parents or any of their ten children.

160. Numerous documents in the Stratton "file" show that the child traffickers targeted the

Strattons because the children were bi-racial and the family members were patriarchal Christians.

161. There are numerous references in documents to "ten bi-racial children" and "interracial marriage."

162. DSS attorney Twila George admitted in 2003 that the Stratton children should be "adopted out" because they were bi-racial.

163. On December 19, 2000, Jack and Kathy Stratton and their ten children all permanently moved from 2423 Eastway Drive. On December 25, 2000, the family moved from Mecklenburg County into a nice home in Gaston County.

164. The Strattons immediately got to know many of their Gaston County neighbors and the children were going to church and to parties in the neighborhood.

165. Pictures were taken at these parties which are easily identifiable as to location and time taken because of sworn testimony of the party participants and the fixed background of the home The pictures show the Strattons' children were happy, healthy, well fed and well-cared for.

166. On December 20, 2000, Dorminey and Caldwell showed up at 2415 Eastway Drive, the home of Joan Stratton, Jack Stratton's mother.

167. Joan Stratton told the social workers that Jack and Kathy had permanently moved from 2423 Eastway Drive and would not be returning. Dorminey became enraged.

168. DSS records show that Dorminey and the DSS had already decided to seize all ten Stratton children, but before they could file Mecklenburg County court documents to obtain jurisdiction over the family, the family moved.

169. The Strattons were now living outside of Mecklenburg County, outside the jurisdiction of the Mecklenburg County DSS and the Mecklenburg County Courts.

**Child Traffickers Perpetrate Extrinsic Fraud Scheme to "Create" Jurisdiction**

170.    After learning their intended victims had moved, the Mecklenburg County DSS and Mecklenburg County District Court Judge David Cayer concocted an extrinsic fraud scheme to make it appear Mecklenburg County had obtained "jurisdiction" over Jack and Kathy Stratton and their ten children.

171.    On December 20, 2000, the DSS filed a (fake) NCGS § 7B-303 "interference petition" naming grandmother Joan Stratton as the sole respondent, **but fraudulently and inconspicuously attaching ten case file numbers (1067-1076) to the interference petition.**

172.    The next day, December 21, 2000 Joan Stratton was illegally hauled to an "interference hearing" under threat of jail and without counsel (in violation of § 7B-303, which only authorizes the hearing afterfive days notice to respondent).

173.    Cayer then generated and signed a fraudulent "order" from the Joan Stratton "interference" hearing, **only Cayer removed Joan Stratton's name as the respondent and replaced it with the names of the ten Stratton children, along with the fraudulent ten case file numbers.**

174.    Cayer's alleged 'order" completely deleted Joan Stratton as the respondent and fraudulently named her as only a "witness" at the hearing.

175.    The N.C. AOC has an official form to be used across the state for court orders pursuant to NCGS § 7B-303 "interference" hearings.  The form is AOC-J-123 entitled "Order to Cease Obstruction Of Or Interference With Juvenile Investigation."

176.    Cayer did not use AOC-J-123, but instead gave it the fake title "Juvenile Order."

177.    Cayer's fraudulent "Juvenile Order" falsely proclaimed that Mecklenburg County had obtained "jurisdiction" over Jack and Kathy Stratton and their ten children.

178.    It is legally impossible that Cayer and the Mecklenburg County DSS obtained jurisdiction

through the Joan Stratton "interference" petition and hearing because:

> (a) Neither Jack and Kathy Stratton or any of their ten children were ever named as parties in the Joan Stratton interference case
> (b) No summonses were ever issued for Jack and Kathy Stratton or any of their ten children in the Joan Stratton interference case.
> © Neither Jack and Kathy Stratton or any of their children were present at Joan Stratton's interference hearing.

179.   Cayer's "Juvenile Order" purported to issue dozens of "findings of fact" and "conclusions of law" finding Jack and Kathy Stratton guilty of "neglect" and "authorizing" the hunting down and seizing of their ten children.

180.   NCGS § 7B-303 does not authorize Cayer or any other judge to hold an ex parte abuse, neglect, and dependency adjudication, to issue "findings" of "neglect", or to authorize the seizure of children.

181.   NCGS § 7B-303 strictly limits the authority of judges to findings that the respondent has or has not interfered with an investigation, and orders that the respondent cease the interference.

182.   By law, any "order" from the Joan Stratton "interference" petition should have: (a) been on AOC-J-123; (b) named Joan Stratton as the sole respondent; and (c) had one case file number to correspond with the one respondent; (d) limited its findings to whether or not Joan Stratton had "interfered" with a DSS investigation.

### The Kidnapping of Jack and Kathy Stratton's Ten Children

183.   On January 30, 2001, Mecklenburg child traffickers crossed over into Gaston County, outside their jurisdiction, and seized Jack and Kathy Stratton's ten children while Jack was at work.

184.   The conspirators generated fraudulent documents in an attempt to cover the illegal seizure.

185.   Mecklenburg DSS agents Gretchen Caldwell, Tyrone Wade, Donna Fayko, and Lisa

Looby generated a fake "petition" falsely claiming the entire Stratton family was living at 2423 Eastway Drive in Charlotte.

186.    Yvonne Mims Evans (Mecklenburg County District Court Judge) generated and signed a fake "Nonsecure Custody Order" alleging to authorize the seizure.

187    It is legally impossible that Evans or the DSS had jurisdiction over any member of the Stratton family because:

(a)  By statute, Evans has no jurisdiction in Gaston County, a fact she has publicly admitted. Evans cannot authorize the seizure of children from Gaston County.

(b)  Evans attached the ten fraudulent case file numbers from the Joan Stratton "interference hearing" to her fake "nonsecure custody order."

(c)  The Stratton parents and children were not parties in the Joan Stratton case and Joan Stratton's case file numbers do not apply to jack and Kathy Stratton or any of their ten children. The N.C. Supreme Court has stated there has never been any case in any federal, state, or local court in which a person who was not a party in an action can be bound by the judgment

(d)  NCGS § 7B-303 mandates that any judicial order issued pursuant to an "interference" hearing is only valid for 10 days.  After that the order expires and any action based on it is null and void.  Therefore, even if the alleged December 22, 2000 "order" signed by Cayer had been valid, the order along with case numbers expired on January 1, 2010 and could not be used for any purpose on January 30, 2001.

(e)  The Joan Stratton "interference" hearing and all its alleged orders are legally null and void in their entirety because the hearing violated the NCGS § 7B-303 mandate that a hearing must be held at least five days after service of the petition.

(f)  The January 30, 2001 documents allegedly used to seize the children were fakes and the "statute" on the fake "nonsecure custody order" does not even statutorily exist.

188.    In addition to the above, the NCDHHS Manual under the heading "Jurisdiction" mandates that if a family moves to another county "during the course of a DSS investigation," the first county has no jurisdiction and must turn the entire case over to the second county.

**Gaston County Sheriff's Deputy Jeanette Seagle**

189.	Gaston County Deputy Jeanette Seagle was on the scene when Jack and Kathy Stratton's ten children were seized. Seagle was a 29 year veteran, a detective, and a guardian ad litem.

190.	Seagle has testified under oath that all ten of the Stratton children were happy and healthy and there was no need for them to be removed from their parents and their home. Seagle attempted to talk the Mecklenburg child traffickers out of seizing the children, but was told by Defendant DSS Supervisor Donna Fayko "We're only here to remove the children."

191.	Fayko is a rabid feminist who openly despises "patriarchal" families. In addition to being a DSS supervisor, she is a supervisors for the Mecklenburg County "domestic violence" program that implements the USDHHS-Jo Ann Bane-DSS agenda "to raise children with equality, we must take them from their parents and raise them communally."

192.	Jeanette Seagle later spoke extensively in a tape recorded conversation with Kathy Stratton. Seagle reassured Mrs. Stratton that she would have to get her ten children back immediately because the Mecklenburg DSS had no jurisdiction in Gaston County.

**Trauma and Assault on the Children at Carolinas Healthcare**

193.	The Stratton children, including (then 11 year old) Plaintiff Solomon Stratton, were illegally taken to Carolinas Medical Center and forced to undergo traumatic assaults on their bodies, including intensive anal and vaginal exams.

194.	There was no court order of any kind authorizing the assaults.

195.	There was no parental consent for the assaults and no consent was ever sought by anyone.

196.	No one ever notified the parents that the assaults were taking place and the parents were not allowed to be present or even know where their children were.

197.	The assaults were perpetrated in spite of the fact that there have never been any allegations of any kind of abuse and DSS records show the original anonymous phone caller

informed the DSS there was no abuse.

198.     CHS medical records from 1-30-01 show there was no abuse or neglect of any of the Strattons' children and that the results of the medical examinations were "grossly normal" for all ten children

## Katherine Dorminey Child Abuse and Attempted Murder

199.     The Strattons' second oldest son Isaiah is a diabetic.  CHS checked his blood sugar upon arrival and it was 199, a fact documented in CHS records.

200.     Katherine Dorminy then took Isaiah into the CHS waiting room and deliberately fed him pizza and sugary soft drinks without the knowledge of CHS medical personnel. (This fact was admitted to by Defendant Caldwell under oath two years later).

201.     After pouring sugar and carbohydrates into Isaiah or an extended period of time, Dorminey had CHS medical personnel "check" Isaiah's blood sugar again, which now read over 600.

202.     Dorminey and Defendant GALs Nikki Fisher and Billie Erwin falsely and fraudulently entered into DSS and GAL records that "Isaiah's blood sugar was over 600 upon coming into custody."

203.     On January 31, 2001, one day after the seizure, Mecklenburg DSS Supervisor Tony Rebol called Plaintiff Jack Stratton at home. Rebol told Plaintiff Isaiah was to be released that night to a foster home that had no experience with diabetics.

204.     Plaintiff told Rebol he did not want Isaiah released to someone who did not know what they were doing because it might kill his son.  Rebol agreed to keep Isaiah in the hospital until the woman in the foster home learned how to control diabetes. This fact is documented in DSS and other records.

205. DSS Supervisor Sherri Glenn, social worker Susan Miller, and GALs Niki Fisher and Billie Erwin repeatedly filed false reports into the "court record" blaming the Strattons by stating that "Isaiah's blood sugar was over 600 upon coming into custody and the hospital could not get Isaiah's blood sugar under control for a week."

206. Plaintiff later learned through hospital records that Dorminey stayed in Isaiah's hospital room all night.

207. Upon information and belief, Dorminey stayed in the room all night and continued to give Isaiah sugary foods so it would keep his blood sugar high.

208. Dorminey was "taken off the case" and never appeared again after she ran up Isaiah's blood sugar. A reporter began investigating her on Sept 4, 2002 and she "resigned" from the DSS two days later on September 6, 2002. Dorminey is now a registered nurse.

209. On September 13, 2001, the DSS and GALs found out Plaintiff Jack Stratton had CHS hospital records documenting their blood sugar fraud. They immediately changed all their reports and never tried the blood sugar scam again

## DSS Case Plan and "Dependency" Fraud

210. From January 30, 2001 to February 5, 2001, Stratton family friend Jackie Pressley called the Mecklenburg County DSS repeatedly and offered to take all ten of the Stratton children into her ten bedroom home on 22 acres of land.

211. The DSS refused to even discuss the matter with Pressley.

212. On March 16, 2001 the DSS generated a fraudulent "case plan" with a "Part A' and a secret "Part B."

213. The DSS gave Jack and Kathy Stratton "Part A" but never showed them "Part B."

214. "Part B" was kept in the "secret DSS files" that parents are unaware exists.

29

215. For two years after their children were seized, the Strattons never knew the case plan had a "Part B."

216. In 2003, Jack and Kathy Stratton discovered that "Part B" of the case plan, dated March 16, 2001, falsely stated that all ten of their children had to be put into foster homes because *"There is no other person willing to take this child."*

217. The child traffickers also declared the Stratton children "dependent" and put into the case plan that all ten of the children were "dependent."

218. NCGS § 7B-101(9) defines a "Dependent juvenile" as *"A juvenile in need of assistance or placement because the juvenile has no parent, guardian, or custodian responsible for the juvenile's care or supervision or whose parent, guardian, or custodian is unable to provide for the care or supervision and lacks an appropriate alternative child care arrangement."*

219. The child traffickers' declaration that the Stratton children were "dependent juveniles" is false on its face because it is a matter of record that: (a) all ten children were seized from a stable home with two parents and a stay at home mom who was with them at all times; (b) Jackie Pressley was willing to take all ten children into her ten bedroom home; and (c) Joan Stratton, the paternal grandmother, was willing to take the children.

220. The DSS "Dependency" fraud, the case plan, and all the false statements contained in it are used to illegally hold the Stratton children and use them to perpetrate massive federal funding fraud.

### Stratton Family Denied All Due Process

221. Mecklenburg County's child traffickers perpetrated the previously set forth extrinsic fraud child trafficking scheme on Jack and Kathy Stratton and their ten children.

222. The Strattons' ten children were all seized illegally and without a court order.

223. The Stratton parents and children received no pre-deprivation or post-deprivation due

30

process.

224.  The Strattons were given all the fake and fraudulent Mecklenburg County "court"

documents, including the "Juvenile Summons" falsely telling them the "seven day hearing" was

just "to appoint counsel" and "set a date for hearing."

225.  Because the Strattons did not receive the statutorily mandated notice of a § 7B-406

summons, they relied on the false statements in the "Juvenile Summons."  As a result, they got

no legitimate legal counsel and were coerced and extorted to a sham "hearing" in a desperate

attempt to get their children back.

226.  Had the Strattons gotten § 7B-406 notice and obtained a legitimate attorney, he would

have been able to challenge the jurisdiction of the Mecklenburg County "court."

227.  On February 2, 2001, Jack and Kathy Stratton arrived for the sham "hearing to appoint

attorneys" and were approached by attorneys" Susan Waller (now Ramos) of the Bush and

Powers Law Firm and Margaret Markey.

228.  Waller was sent by William Powers, who had been "appointed" to Plaintiff Jack Stratton.

Markey was 'appointed to Kathy Stratton.

229.  The Strattons told the attorneys they wanted to fight the false allegations in the DSS

petition.  Waller and Markey told the Strattons that "this is not the time for that" and "this

hearing is just to appoint attorneys."

230.  At the "hearing," Plaintiff Jack Stratton stood up and tried to fight the false charges.

Defendant Judge Elizabeth Miller (now Killegrew) told Plaintiff "this is not the time for that."

231.  Miller also refused to release any of the children to relatives as mandated by law.

232.  GAL Billie Erwin and GAL attorney Niki Fisher had already been "appointed"

(fraudulently attached) to the Strattons' ten children.

31

233. Erwin and Fisher were 'appointed" without the parents consent or knowledge and before the parents had been found "guilty" of anything.

234. The Strattons never had the hearing mandated GS § 7B-506.

235. Plaintiff later obtained the fraudulent "Initial (7-Day) Order" falsely claiming he and his wife had "consented to the nonsecure custody."

Plaintiff and his wife **never** consented to the state holding any of their children, nor would they ever consent.

236. The Strattons' ten children continued to be illegally held in state custody in violation of NCGS § 7B-506(a) which states that "no juvenile shall be held…." Without the hearing.

237. The Strattons were not even aware of the mandated NCGS § 7B-506(e) hearings and were fraudulently denied the hearings. Their ten children continued to be illegally held.

### Breaking and Entering and Extrinsic Fraud

238. On February 2, 2001, after the sham "hearing to appoint attorneys" DSS Supervisor Katherine Dorminey and Guarian ad Litem attorney Nikki Fisher went together to 2423 Eastway Drive, where the Stratton family had permanently moved from on December 19, 2000. No one was there.

239. Dorminey and Fisher broke into the building without permission from the owner or anyone else.

240. After deliberately trashing the inside, Dorminey and Fisher took pictures.

241. Fisher falsely claimed the pictures she and Dorminey illegally took on February 2, 2001 were taken on December 20, 2000, "the day after" the Strattons moved.

242. For two years, the DSS, the GALs, Brett Loftis, and "the court" falsely claimed the pictures were "evidence of where the children were living when they were taken."

243. In early 2003, Fisher admitted under oath that the pictures were actually taken on February 2, 2001 and that she and Dorminey had broken in without permission to take them.

**Stratton Child Hostages Used to Extort Parents**

244. To cover their illegal seizure of the Stratton children, the child traffickers attempted to get the parents to sign a "Dependency Mediation Agreement."

245. None of the Stratton children have ever at any time been "dependent."

246. Plaintiff Jack Stratton made it very clear at all times that he was not going to sign the document, but that he wanted a trial to expose the crimes of the DSS in kidnapping his children.

247. On March 12, 2001 Defendant Judge Miller (acting without jurisdiction) threatened five separate times to put Plaintiff Jack Stratton in jail if he refused to sign the "Dependency Mediation Agreement."

248. Plaintiff steadfastly refused to sign. Plaintiff told Miller repeatedly he did not agree with the document and that he wanted a trial.

249. DSS Attorney Tyrone Wade stood up and declared in hostile tones "If Mr. Stratton wants a trial, we'll just have to hold his children another six months. We'll be glad to do that." This statement is a matter of record.

250. A "recess" was then called. Jack and Kathy Stratton went into the hallway with their (conspirator) "court appointed attorneys" Defendants Rick Lail and Margaret Markey.

251. Markey told the Strattons that if (Plaintiff) Jack Stratton would go back in and sign the "Dependency Mediation Agreement" Markey would get their children back that very day.

252. Plaintiff began to contemplate Wade's threat to hold his ten children for six months vs. Markey's assurance that she would get the children back that very day.

253. Plaintiff, desperate to get his children back, went back into the hearing and signed the

document he never wanted to sign. His children were never returned.

254.   Plaintiff states unequivocally that he was the victim of extortion and the only reason he signed the document was in a desperate attempt to get his children back.

## Isolation, Torture, and Brainwashing of the Children

255.   After being seized from their home in Gaston County, the eight youngest children were taken to a remote wooded area.

256.   The child traffickers subjected the children to a program of systematic psychological torture and brainwashing designed to alienate the children from their parents, "break them" psychologically, and divest them of their Christian beliefs.

257.   Child and family Development, Robert Faucette, Jennifer Hartwig-Lindstom, Southeastern Psychological Associates, Stephen Strzelecki, Thompson Child and family Focus, Vanessa Warren, Baheerah Muwwakkil, and Stacy Chatman were all paid large sums of money by the DSS to: (a) conduct a systematic campaign of psychological torture and brainwashing against the Stratton children; (b) systematically alienate the children from their parents and their previous belief system; and (c) "break" the children psychologically and then "reassemble" their personalities into the image desired by the rabid DSS feminists; (d) purge the girls from their previous natural desire to be mothers and instill a selfish feminist belief system in them (e) purge the children from their natural desire to go back to their parents; and (f) put the children in public schools to corrupt their morals and values and destroy their personalities as inculcated in them by their parents.

258.   All of the above was done illegally, against the will of the parents and the children, and without any parental consent.

259.   The brutal program against the Stratton children mirrored the atrocities Defendant

34

Richard Jacobsen had perpetrated against eight year old Alicia Wade in San Diego.

260. On June 28, 2001 the child traffickers completely cut the Strattons off from their ten children to facilitate the brainwashing process.

## THE SECOND KIDNAPPING OF SPENCER STRATTON

261. On January 14, 2002, the Strattons oldest son Spencer turned 18.

262. Mecklenburg County continued to hold Spencer without any paperwork whatsoever.

254. Plaintiff Jack Stratton went to Metro School in Charlotte to get his son.

263. Spencer wanted to come home with his dad, but Metro School social worker Ira Chase kidnapped Spencer and held him against his will on a school bus.

264. Plaintiff called the Charlotte Mecklenburg police and reported the kidnapping.

265. While Plaintiff was reporting the kidnapping, Chase hid Spencer somewhere inside Metro school and continued to hold him against his will.

266. Four Charlotte-Mecklenburg police officers and a detective arrived. Plaintiff told them about the kidnapping of his son and demanded action.

267. The four police officers and the detective refused to do anything about the kidnapping and instead began to verbally berate and attack Plaintiff.

268. The principal of Metro School told Plaintiff to "come back about 3 pm." Plaintiff later discovered that at the time she said this, she knew that (Defendants) school board attorney Michelle Morris, city attorney Dewitt McCarley, DSS attorney Tyrone Wade, and Mecklenburg District Attorney Peter Gilchrist were setting up an "emergency guardianship hearing" for 2 pm.

269. Plaintiff left Metro and went to Peter Gilchrist's office demanding action to stop the kidnapping. Gilchrist refused to come out and his subordinates told Plaintiff he would have to file a complaint with the police.

270. Plaintiff went to the Charlotte-Mecklenburg Police Department and attempted to file a kidnapping complaint. The police refused to take the complaint.

271. When Plaintiff insisted on filing a criminal complaint, the police became extremely hostile and ordered Plaintiff out of the building. Plaintiff refused and asked to see a supervisor. When the supervisor came out she refused to allow Plaintiff to file a criminal complaint.

272. Plaintiff then demanded to file a complaint against the police for refusing to take Plaintiff's criminal complaint.

273. The police refused to allow Plaintiff to file a complaint against any police officer or anyone else.

274. Plaintiff left the building. On the way out Plaintiff saw a police brochure on the wall and took a copy with him. It was entitled "Anyone Can File a Complaint."

275. Plaintiff's son continued to be held against his will for another month.

276. In 2005, Plaintiff attempted to obtain the police reports from the incident but the police department refused to give them to him.

277. Plaintiff contacted Defendant City Attorney McCarley and demanded the entire file relating to the kidnapping. McCarley has yet to produce the files.

278. On February 22, 2002 Spencer Stratton was returned to his parents.

279. When he was returned, he had been physically starved and abused so badly, he was virtually unrecognizable to family and friends.

### MASSIVE STATE COVER-UP

280. In late 2002 there was massive media coverage in Charlotte, N.C. pursuant to the Mecklenburg County DSS seizure of the Stratton children. The child trafficking operation in the state was in danger of being exposed.

281.   The enterprise perpetrated a massive cover-up.  On October 9, 2002 Attorney General

Roy Cooper, Deputy Attorney General Jim Coman, Mecklenburg County District Attorney Peter

Gilchrist, and Mecklenburg County Manager Harry Jones issued a phony "press release" signed

by Coman.  It claimed the Attorney General's office had fully investigated and found no

evidence of criminal wrongdoing against the DSS.

282.   The phony "press release" was published in a large and conspicuous location in the

Charlotte Observer (the propaganda arm of the child trafficking enterprise).

283.   The press release was a fraud.  Plaintiff Jack Stratton had repeatedly called Coman at the

Attorney General's office in an effort to submit evidence of crimes. Coman refused to talk to

Plaintiff or even return his phone calls. No evidence was ever accepted.

284.   Plaintiff maintains it is self evident that if Coman or anyone else had examined the

Stratton files, they would have seen evidence of numerous crimes, including that the Stratton

children were seized without jurisdiction from Gaston County, that Gretchen Caldwell submitted

a perjured petition, and that the § 7B-503(3) state mandated AOC Summons had been replaced

with a facially fraudulent "Juvenile Summons."

285.   On October 11, 2002, two days after the first fraudulent press release, Harry Jones issued

another claiming that the North Carolina Department of Health and Human Services had

conducted a thorough investigation and *"The comprehensive review…confirms that the*

*Mecklenburg County Department of Social Services, Youth and Family Services staff, has*

*complied with law, policy and standards in this case."*

286.   Plaintiff maintains it is self evident that the second press release was a fraud because the

NCDHHS oversees the Mecklenburg DSS and its operations and is joined in the use of the fake

court documents including the facially fraudulent "Juvenile Summons."

287. Simultaneously with the phony press releases, the Mecklenburg County Commissioners and Harry Jones set up a "Stratton" website containing numerous provably false statements.

### Extrinsic Fraud "TPR" Scheme

288. On December 2, 2002, the child traffickers purported to conduct a "termination of parental rights hearing" ("TPR") which was in fact an extension of the child trafficking scheme.

289. Plaintiff alleges the plan was to issue a fraudulent "finding" that Mecklenburg County did have jurisdiction two years earlier. Then if the jurisdiction was later challenged in a legitimate court, the conspirators would invoke the preclusive effect of the Constitution's "full faith and credit clause."

290. NCGS § 7B-1103(3) states that "A petition to terminate the parental rights of either or both parents...may only be filed by...Any county department of social services...to whom custody of the juvenile has been given by a court of competent jurisdiction;"

291. As has been shown, Mecklenburg County had no jurisdiction to seize the Stratton children from Gaston County. Therefore the Mecklenburg County DSS was not given custody by a court of competent jurisdiction and had no standing to file the TPR.

292. The conspirators brought in Margaret Sharpe for the sham hearing and proclaimed her an "independent judge from Greensboro." In fact Sharpe was no judge at all, as she had been defeated in her last election. Sharpe was a "judicial trespasser."

293. Further showing that the entire TPR was a fraud is the fact that Sharpe and all of the DSS and GAL attorneys at the hearing were using the fake Mecklenburg County court documents including the facially fraudulent "Juvenile Summons."

294. At the time only the child traffickers were aware the documents being used were fraudulent. Plaintiff Jack Stratton discovered the extrinsic fraud years later by accidently

38

stumbling upon the real AOC court forms in a library.

295. Sharpe, acting in a secretive closed room, prevented Plaintiff and his wife from challenging the jurisdiction, and then issued a fraudulent "finding" that the DSS had obtained jurisdiction based on the Joan Stratton "interference" case, a legal impossibility.

296. When Plaintiff Jack Stratton and his wife tried to appeal Sharpe's "finding of jurisdiction" to the North Carolina Court of Appeals, the COA (illegally) blocked the Strattons' access to the courts by refusing to allow the Strattons to even file an appeal.

297. As previously shown, all of the N.C. Appellate judges are necessarily joined in the child trafficking enterprise by virtue of their regular review of fake Mecklenburg County juvenile documents, including the facially fraudulent "Juvenile Summons."

## "Cachectic" Extrinsic Fraud

298. Carolinas Healthcare System medical records dated 1-30-01 on all ten Stratton children show all the children were healthy upon arrival and their medical exams were all "grossly normal."

299. Two years later, during the alleged "TPR hearing", it was alleged by Defendant DSS social worker Kathy Smith for the first time that the three oldest children were "cachectic" (wasting away) on 1-30-01.

300. Plaintiff Jack Stratton has in his possession dozens of pieces of evidence showing this claim to be completely false and fraudulent.

These include: (a) Numerous CHS medical records from 1-30-01; (b) CDC weight charts; (c) Pictures taken immediately before the seizure of the children; (d) sworn testimony from Gaston County Sheriff's Deputy and guardian ad litem Jeanette Seagle; (e) sworn testimony and letters from numerous other independent witnesses.

39

301. The document containing the "cachectic" allegation bears the alleged signature of Dr. Michael Giftos. Giftos was an intern at CHS on 1-30-01.

302. On or about June 15, 2005 Plaintiff went to Gitftos' house in Charlotte, confronted him with the fraudulent document, and asked him if it was his signature.

303. Giftos acted confused and stated he would have to "check into it and get back with you."

304. Giftos never contacted Plaintiff as promised, so on August 20, 2005 Plaintiff called Giftos at his home.

305. Giftos told Plaintiff "the lawyers told me not to talk to you."

306. Plaintiff asked "what lawyers?" Giftos replied "The hospital lawyers."

309. Plaintiff asked Giftos what he was going to do about the fraudulent document with his name on it.

307. Giftos stated "Mr. Stratton, I'm going to have to ask you not to contact me anymore. You're going to get me in trouble. Giftos then hung up.

308. Less than two weeks after the call, Plaintiff was ambushed at 11 o'clock at night by eight men. The men beat Plaintiff down in the street, kicked him in the face, put a gun to his head, and stated they were going to 'blow his head off."

309. Apparently someone heard the noise and turned on a light after which the leader told the other men "Let's get out of here."

### Clerk of Court Martha Curren at the Center of the Mecklenburg County Child Trafficking Enterprise

310. Mecklenburg County Clerk of Court Martha Curren is joined in three critical elements of the county's child trafficking enterprise: (a) She oversees the fraudulent juvenile documents used to steal children; (b) She controls all the "adoptions" of the stolen children; (c) She controls and

uses the "Guardianship" program to continue to hold the child victims after they turn 18.

312. On October 1, 2003 the Strattons' second oldest son Isaiah turned 18.

313. Isaiah had been repeatedly molested in DSS foster homes for over a year in 2001-2002 with the full knowledge of the child traffickers, including Martha Curren.

314. Curren and her child trafficking co-conspirators continued (without jurisdiction and through a series of acts of extrinsic fraud) to hold Isaiah in state custody for another year

315. Plaintifff alleges Curren was holding Isaiah to protect herself and her co-conspirators in the Mecklenburg child trafficking conspiracy from being sued exposed by Isaiah and his parents.

316. On April 29, 2004, Plaintiff Jack Stratton was in a room in the Mecklenburg County Courthouse confronting Curren and demanding that she return Isaiah, when Plaintiff had a heart attack.

317. In late 2004, Plaintiff Jack Stratton and his son left the state "without permission."

318. Curren and Defendant Frederick Benson, attorney for the Association of Retarded Citizens (ARC of Mecklenburg County) collaborated to generate a document alleging to be an "emergency order." It purported to "authorize every law enforcement agency in the United States to seize Isaiah Stratton."

319. County clerk Curren had no authority for such nationwide "authorization."

320. The alleged "order" was issued without any due process of law or notice and opportunity for anyone to respond.

321. Plaintiff alleges the "order" was a continuation in the extrinsic fraud perpetrated by the child traffickers to protect themselves and their enterprise from exposure.

322. No warrant, "amber alert" or other official process was ever issued.

323. On information and belief, Curren and the child traffickers did not want to arrest Plaintiff

Jack Stratton because it would have given him and his family a constitutional criminal trial that would have exonerated the Strattons and exposed Curren and the child trafficking operation.

324.    On information and belief, Curren and her child trafficking co-conspirators wanted to "quietly" seize Isaiah, in keeping with their usual methodology of acting under a "cloak of secrecy" and in the complete absence of due process.

### Curren's Alleged "Emergency Seizure Order" Shown to be Fraudulent

325.    After they left the State of North Carolina, Plaintiff and his son Isaiah went straight to the Congressional building in Washington to Congressman Walter Jones' office.

326.    Plaintiff and his son sat down with Jones' chief of staff and told her the entire story.

327.    On the way back from Washington, Plaintiff and his son were stopped by a Maryland state trooper because Plaintiff's taillight was out.

328.    After the stop, the trooper became aware that Curren and North Carolina had issued a "secret order" to have Isaiah returned to North Carolina.

329.    Two additional state troopers were called. They looked at Isaiah and asked if that was him. Plaintiff told them it was.

330.    The troopers stated they were going to hold Plaintiff and his son until they "found out what North Carolina wanted to do."

331.    Plaintiff told the troopers that "it doesn't matter what North Carolina wants to do. My son is 19 and can go where he wants."

332.    About 45 minutes later, the troopers let Plaintiff and Isaiah go, profusely apologizing and telling Plaintiff "We were just doing our job."

323.    Meanwhile, back in Mecklenburg County, Curren and the Charlotte-Mecklenburg Police Department engaged in a campaign of threats and harassment against Kathy Stratton and the

Strattons' son Spencer.

334. Plaintiff heard about the threats. He decided to deposit his wife and two oldest sons Spencer and Isaiah in another state and then came back to Mecklenburg County to face the child traffickers.

335. On January 5, 2005 Plaintiff came back and confronted Curren, holding a press conference in the Charlotte Mecklenburg Government Center.

336. Radio, television, and print media were present at Plaintiff's news conference.

337. Two Mecklenburg County Sheriff's Deputies watched the press conference while talking on cell phones and walkie-talkies.

338. Martha Curren and Charlotte law enforcement were fully aware Plaintiff was holding a press conference in their own Government Center, yet they never attempted to arrest Plaintiff or tried to enforce Curren's alleged "emergency seizure order."

### More Extrinsic Fraud

339. On January 5, 2005, immediately after the press conference, Plaintiff Jack Stratton went to the Mecklenburg County Courthouse and attempted to file a habeas petition naming Yvonne Mims Evans as the judge.

340. Plaintiff wanted to file the petition instead of giving it to Evans so that it would be a matter of record and Evans could not do something duplicitous.

340. Plaintiff was told by clerk Lynette Richter that she could not file the habeas petition because "my computer is down."

341. A second clerk smirked and said "My computer's down too."

342. The third clerk in the room stated "My computer's down too."

343. Plaintiff's wife later discovered through her attorney Kate Chester that the computers had

not been down and that Defendant DSS attorney Robert Adden was bragging to Chester "Isn't it

funny how the computers were working five minutes before Jack Stratton get there and five

minutes after he left?"

344.    William Hammer, publisher of the Rhino Times newspaper, accompanied Plaintiff to the

courthouse and was a witness to the clerks' actions.

345.    Plaintiff came back the next day and attempted to file the habeas petition.  This time

Richter told him she could not file the petition because Plaintiff "did not have a home phone

number."

346.    Plaintiff asked Richter where Evans was so he could give the petition to her personally.

347.    Richter stated that Evans was sitting as a judge in another county and would not be back

until March.

348.    Plaintiff traveled to the other county courthouse on a Friday and asked the clerks which

courtroom Evans was in.  They stated she had "gone for the day."

349.    Plaintiff attempted to file the habeas petition in the second courthouse but the clerks

repeatedly made up excuses not to take it.

350.    Plaintiff went back to Richter at the Mecklenburg County Courthouse and got her to file

the habeas petition into the computer.  However, she stated that Evans would not be able to rule

on the petition until March when she returned to Mecklenburg County.

351.    Plaintiff left with the expectation that the petition would be heard in March as he was

told.

352.    Because the first habeas petition had been hastily prepared and was not well done,

Plaintiff decided to prepare another one and file it in place of the first.

353.    When Plaintiff went to Richter and attempted to file the second petition in place of the

first, Richter stated that the "case has been closed."

354.    Several days later, Plaintiff received an alleged "Order" in the mail from an unknown

judge.

355.    The alleged "order" stated that: (a) Evans had "recused herself" from hearing the habeas

petition; (b) a "previous" habeas petition "had already been ruled on"; and (c) "previous orders"

(Sharpe's fraudulent TPR) "made the habeas moot" and Plaintiff "had no standing to file a

habeas" since his "parental rights" had been (allegedly) "terminated."

356.    In addition to the massive extrinsic fraud shown above, NCGS Chapter 17 mandates that

any judge presented with a habeas must rule on it. "Recusal" is not an option.

### Curren Extrinsic Fraud Exposed

357.    For over a year, Kathy Stratton, Spencer Stratton, and Isaiah Stratton stayed with friends

in Missouri while Plaintiff Jack Stratton stayed in Mecklenburg County and publicly confronted

Martha Curren and other public officials.

358.    Plaintiff went to the Charlotte FBI office to try to get the FBI to investigate Curren and

the child traffickers.  During the conversation, Plaintiff told Charlotte FBI agent Julia Muller his

wife and children were in Missouri.

359.    The FBI never arrested Plaintiff or pursued the matter even though Mecklenburg County

was claiming Plaintiff took his son across state lines without legal custody, the federal definition

of kidnapping.

359.    For the entire year of 2005, Curren, the Mecklenburg Board of County Commissioners,

the Charlotte-Mecklenburg Police Department, the Mecklenburg County Sheriff's Department,

the Charlotte FBI, and the Charlotte news media were fully aware that Plaintiff had left with his

son Isaiah and returned without him. Yet Plaintiff was never arrested, never once questioned by

Curren or confronted with Curren's order, and never questioned by law enforcement.

360.  During this time, Plaintiff went on television before the Mecklenburg County Commissioners and the entire county, held up Curren's "emergency order" to seize Isaiah Stratton, and ripped it up on TV.

361.  The entire incident was the lead story that night on Charlotte television station WBTV.

362.  Plaintiff later demanded on TV to be arrested for taking his son out of state. Curren and Mecklenburg County officials refused to arrest or even question Plaintiff.

### THE THIRD KIDNAPPING OF SPENCER AND ISAIAH STRATTON

363.  In 2006 Plaintiff rejoined his wife and sons out of state.

364.  In late 2006, Jack and Kathy Stratton and their two oldest sons Spencer and Isaiah were living in Blackhawk County, Iowa.

365.  Martha Curren and the Mecklenburg County child traffickers used individuals in Iowa to attack the Stratton family and seize Spencer and Isaiah Stratton.

366.  During the week of September 15-22, 2006 Curren and her co-conspirators had Iowa police officers conducting surveillance on the Strattons and "casing" the situation.

367.  Curren then took the exact same fraudulent "emergency order" she had concocted in 2004 for the seizure of Isaiah Stratton, changed the date to September 22, 2006, added Spencer Stratton, and sent it to Iowa.

368.  The fraudulent two year old "order" continued to claim it was an "emergency" situation.

369.  On September 22, 2006, Ceder Falls (Iowa) police captain Michael Hayes showed up at the Strattons' with armed Cedar Falls police officers Jeff Harrestein, Dan Brown, Mark Rath, K. Altenbaumer, and Rick Ahlstrom.

370.  Iowa social worker Sharon Wright was with the police.

46

371.   Hayes demanded that the Stratton parents turn over Spencer and Isaiah to be "returned to North Carolina."

372.   Hayes and Wright had no warrant for the seizure.  Hayes said he was acting on "orders from North Carolina."

373.   Plaintiff demanded to see a warrant.  Hayes then told his armed officers "Hold them here while I get a warrant."

374.   Plaintiff, his wife and their two sons were held by armed officers without a warrant while Hayes allegedly went to "get a warrant."

375.   Hayes returned with an alleged "warrant" that he obtained by submitting numerous false statements under oath.

376.   The warrant falsely alleged that Jack Stratton had kidnapped his son Spencer at Isaiah five years earlier and had been "hiding out" since then.  The warrant alleged Plaintiff and his sons had 'just been found" in Iowa and that the two sons were in a dire emergency situation.

377.   Plaintiff told Hayes his warrant was defective and no good, that Plaintiff's sons had been repeatedly sexually molested in North Carolina, and that he was not going to turn them over to Hayes.

378.   Plaintiff also offered to immediately take his sons to the hospital to prove they were in good health. Hayes' response was "No, they're going back to North Carolina."

389.   Plaintiff stood with his arms down in front of the door in anon-threatening manner and refused to move.

380.   The rogue officers grabbed Plaintiff and slammed his head through a door.  As Plaintiff was lying on the ground motionless, they jumped on Plaintiff, pepper sprayed him in the face, and began to repeatedly tazer him.

381.    Plaintiff never moved as he lay on the ground, yet the police continued to tazer him without cause.

382.    Plaintiff has a permanent heart condition because of the heart attack he had while confronting Curren about his son Isaiah.

383.    After repeated tazering, Plaintiff began to feel the life leaving his body.

384.    Plaintiff told the rogue police officers he had a heart condition and the tazer was killing him. When Plaintiff told them this, the police immediate stuck the tazer to Plaintiff's heart and pulled the trigger.

385.    About that time a passerby came upon the scene and the rogue police officers were forced to stop the murder in progress.

386.    Plaintiff was arrested for "misdemeanor interference with a police officer" and was taken to jail.

387.    The police and Defendant Wright then broke into Plaintiff's residence and arrested Kathy Stratton, who was sitting on a bed, for "misdemeanor interference with a police officer."

388.    The police and Wright seized Spencer and Isaiah Stratton.

389.    Medical exams were performed that proved there was nothing wrong with Spencer and Isaiah and there was no "emergency." This fact was documented in medical and social worker records.

390.    On September 25, 2006 the Strattons went to the Blackhawk County Courthouse, where they were met by social worker Wright. Wright appeared extremely frightened as she told the Strattons that medical exams proved their was no emergency situation, that their sons got a clean bill of medical health, and that all social worker allegations were now confirmed as "unsubstantiated."

391. Meanwhile, when Curren learned her allegations of an "emergency situation" had been proven false, she fraudulently and retroactively changed the reason for the seizure to "the Strattons were homeless."

392. At the Iowa Courthouse, Sharon Wright told the Strattons if they went to the 'hearing' they would get their son Spencer back. Based on this assurance, the Strattons went into the "hearing" (held in the absence of jurisdiction) but did not get Spencer back.

393. Plaintiff later learned that there was no case file on any member of the Stratton family anywhere in any of the Iowa courts, as required by law.

394. There had never been any case file. The entire alleged "case" was perpetrated by massive extrinsic fraud.

395. Plaintiff's sons were seized and transported across sate lines without any due process whatsoever, no notice or opportunity to respond, back into the clutches of their tormentors and sexual molesters in North Carolina.

396. Plaintiff tried to file an emergency federal habeas petition in Iowa but was prevented by another series of extrinsic fraud maneuvers by Federal District Court Judge Linda Reade.

397. Reade, a former juvenile court judge from Blackhawk County, refused to hear Plaintiff's emergency habeas petition.

398. Plaintiff insisted on filing the petition, but was told that the filed petition would "never be heard in the Iowa federal courts."

399. Reade waited until Plaintiff's two sons were transported to North Carolina, outside her jurisdiction. She then secretly and fraudulently issued (without jurisdiction) a purported "order" denying the habeas, claiming a habeas cannot be filed in federal court, and alleging that Plaintiff had no standing to file a habeas because his "parental rights had been terminated."

400.	Plaintiff's sons were adults, not minors. Further showing Reade's fraud, there had never been any allegation by anyone, even Mecklenburg County and Martha Curren, that Plaintiff's parental rights to Spencer Stratton had been "terminated." Reade made it up.

401.	Furthermore, Reade's fraudulent statement that Plaintiff's "parental rights were terminated' as to Spencer and Isaiah Stratton is provably false as matter of record.

402.	Reade is fully aware that federal habeas statutes are constitutional mandates and the only requirement for a habeas petition is that the individual is "in custody in violation of the constitution and laws of the United States."

403.	After attempting to issue the fraudulent "habeas denial" Reade compounded her extrinsic fraud scheme by simultaneously and illegally closing the case file and ordering the clerks to prevent Plaintiff from ever filing anything into the case again.

404.	Reade prevented Plaintiff from appealing her fraudulent (and jurisdictionally void) "order" and then sent documents to the Circuit Court falsely and fraudulently telling them Plaintiff did not want to appeal and had "withdrawn his appeal."

## COUNCIL FOR CHILDREN'S RIGHTS

405.	The Council for Children's Rights is a criminal front set up by the Mecklenburg County child trafficking enterprise. It is the result of a 2006 merger between the Council for Children and the Children's Law Center

406.	The Director of the Council for Children's Rights is Brett Loftis.

407.	Loftis and Council for Children's Rights attorneys are officially attached to juvenile cases by the Mecklenburg County Courts and function as state actors.

408.	Loftis and Council for Children's Rights attorneys are fully joined in the child trafficking scheme outlined herein.

pay money to the enterprise for "child support" and for compelled contracts.

423.    Plaintiff Solomon Stratton was kidnapped and held as a slave to work for the enterprise.

424.    Plantiff Solomon Stratton was held hostage while his body and person were used to fraudulently obtain money from the federal government.

424.    The enterprise has operated for decades and continues to operate from within legitimate government.

### CLAIM III.
### Title VI. Civil rights Violations.

425.    Paragraphs 1-424 are incorporated as if fully set forth herein.

426.    Plaintiffs are the victims of religious and racial genocide.

427.    Defendants have openly declared their malevolent agenda to destroying patriarchal Christians and their families.

428.    Defendants misuse the power of the state to carry out state acts of violence by seizing the children of patriarchal Christians, including Plaintiff Solomon Stratton and his nine brothers and sisters.

429.    After kidnapping the Stratton children, the Defendants held the children hostage and used them for extortion, demanding the Stratton parents to go into fraudulent "domestic violence programs" or lose their children.

### CLAIM IV.
### Assault and Battery and Intentional Infliction of Emotional Distress

425.    Paragraphs 1-424 are incorporated as if fully set forth herein.

426.    Defendants have isolated Solomon Stratton without case from his parents and his brothers and sisters, held him hostage, and subjected him to systematic isolation and physical and psychological torture.

409. Loftis and the Council for Children's Rights participate fully in the conspiracy and extrinsic fraud, including using fraudulent "court documents" such as the fake "Juvenile Summons" to eliminate § 7B-506 hearings so as to illegally hold and "adopt out" children.

410. Loftis and the Council for Children's rights need the bodies of little children in order to funnel money to their criminal front organization. They obtain their child victims through the DSS child trafficking operation.

411. Council for Children's Rights Director Brett Loftis was attached to the Stratton children and was a participant in all of the extrinsic fraud heretofore set forth, including but not limited to using the aforementioned facially fraudulent "Juvenile Summons" and other fake court documents.

412. Loftis oversaw and was responsible for the brainwashing and psychological torture of the Strattons' ten children.

**Loftis Meets Secretly With Mecklenburg County Judges, Social Workers, and Guardian ad Litems to Plot Against Parents**

413. Brett Loftis meets secretly behind closed doors with Mecklenburg County juvenile court judges, social workers, guardian ad litems, and others to plot and scheme against parents. Such a meeting was held on February 25, 2002 under the auspices of the Mecklenburg County Juvenile Crime Prevention Council.

414. The minutes of that meeting show Loftis asking the juvenile court judges what he can do to force parents to enter into his programs (compelled contracts). The judges show Loftis how to file motions to put the parents in jail for not signing the contracts.

415. The conspirators also meet under the auspices of two secret (state actor) conspiratorial groups entitled "The United Agenda for Children" and "The Children's Alliance." These groups are Mecklenburg County cells of an international conspiracy to take away parental rights and

51

turn all child rearing over to the state.

416.    When Plaintiff requested "open records" on these two groups from the state participants, the groups' websites were hastily taken down.

## CLAIM I.
### 42 USC 1983 Conspiracy

417.    Paragraphs 1-416 are incorporated as if fully set forth herein.

418.    Defendants operate a two decades old criminal child trafficking conspiracy that uses massive extrinsic fraud to kidnap children from their parents, hold them illegally in state custody, and permanently separate them from their natural family.

419.    Defendants are joined in the criminal enterprise and are responsible for 'conscience shocking" violations of Plaintiffs' rights as protected by the Constitution, as set forth below:

> A.    First Amendment right to practice their religion, right to privacy, right to freedom of association, right of access to courts;
> B.    Fourth Amendment right to be free from unreasonable searches and seizures;
> C.    Fifth Amendment right to be free of self-incrimination;
> D.    Sixth Amendment right to face one's accusers and effective assistance of counsel;
> E.    Eighth Amendment right to be free from cruel and unusual punishment;
> F.    Fourteenth Amendment protection of parental rights, familial rights, right to substantive and procedural due process.

## CLAIM II.
### Violation of 18 USC § 1964, et seq. (RICO),

420.    Paragraphs 1-419 are incorporated as if fully set forth herein.

421.    Defendants operate a criminal RICO child trafficking enterprise. Predicate crimes perpetrated within the enterprise include child kidnapping, child abuse, federal funding fraud, extortion, mail and wire fraud, and other federal and state crimes.

422.    Plaintiffs have been severely injured in their business and property by being extorted to

52

## PE SE MALICE ON ALL CLAIMS

427.    Perpetrating horrendous acts against innocent children to further a criminal enterprise constitutes *per se* malice on all claims.

## JURY TRIAL DEMANDED

428.    Plaintiffs demand a jury trial on all issues of fact.

## REQUEST FOR RELIEF

WHEREFORE Plaintiffs each request the following relief:

1.      Plaintiffs each awarded one hundred million dollars in compensatory damages and one billion dollars in punitive damages from Defendant Mecklenburg County Department of Social Services.


2.      Declaratory and injunctive relief to be submitted by Plaintiffs prior to trial.

3.      Any other relief for Plaintiff deemed proper by the court.


This the 22nd day of March, 2010.

Jack Stratton                                    Solomon Stratton
PO Box 480466                              PO Box 480466
Charlotte, NC, 28269                      Charlotte, NC, 28269
980-621-9450                                980-621-9450